CATHERINE WEBER, INDIVIDUALLY AND ON BEHALF OF WILLIAM GEORGE WEBER, A MINOR, PETITIONER-RESPONDENT, v. WESTERN ELECTRIC COMPANY, INC., A BODY CORPORATE, RESPONDENT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued February 11, 1969—Decided March 21, 1969.

Before Judges GAULKIN, COLLESTER and LABRECQUE.

*Mr. Louis J. Douglass* argued the cause for appellant (*Messrs. Mead, Gleeson, Hansen and Pantages,* attorneys).

*Mr. Benjamin Madnick* argued the cause for respondent (*Messrs. Madnick, Milstein & Mason,* attorneys).

PER CURIAM. In this workmen's compensation heart fatality case both the Division of Workmen's Compensation and the County Court judge, in a *de novo* review, found that the decedent's death was causally related to his work effort. We conclude that the findings of the County Court could reasonably have been reached on sufficient credible evidence present in the record, considering the proofs as a whole. *Close v. Kordulak Bros.,* 44 *N. J.* 589, 599 (1965).

Judgment affirmed.

GAULKIN, S. J. A. D. (dissenting) : Perhaps some day death benefits will be paid to dependents of all workers. I would be in favor of that, especially when the worker has worked for years for one employer, as decedent did here. But

that is not yet the law. Therefore, I had hoped that *Close v. Kordulak Bros.*, 44 *N. J.* 589 (1965) would enable me to concur. However, a study of the record, and particularly the testimony of petitioner's Dr. Goodman, forces me to the conclusion that the award is not supported by the evidence, however liberally that evidence is considered.

Decedent was 56 years old, overweight, five foot seven and weighing 215 to 225 pounds. In 1953-1954 he had been under the care of a doctor for diabetes, but there is no evidence that thereafter, and until August 13, 1967, when he died, he had any medical attention for this or any other condition. His wife stated that he dieted. However, she testified that he had a good appetite, and apparently he was accustomed to eating large meals, for she testified that on the evening of his death she had prepared for his dinner chicken soup, roast beef, mashed potatoes and gravy, lettuce and tomatoes, corn on the cob and coffee.

On the day of his death he worked from 7 A.M. until 3:30 P.M. with no complaint or sign of distress. He had been on vacation for the month of July. At about 3:45 P.M. he went home with fellow employees in a car pool in which he rode as a passenger. The fellow employees testified that during the 36 mile drive to his home he exhibited no signs of illness and made no complaint; on the contrary, he "was kidding" one of his companions "about the Yankees" because the companion was a Yankee fan. He arrived home about 4:45 P.M. and died nearly 5 hours later.

Dr. Goodman testified that he died of a coronary thrombosis or a coronary occlusion caused by (1) physical exertion (2) emotional strain and (3) extreme heat. In answer to a hypothetical question, he said:

"In this particular individual I feel * * * there was sufficient strain and effort of a physical nature, and as [sic] a strain placed on him by his environment, and possibly, from what you have told me on the emotional aspects, such that he did develop increased heart rate, blood pressure, broke off the plaque and had his infarction.

Now, when these events occur in an individual symptoms or signs arise. The first one, of course, is severe chest pain which — I'm

sorry, I should say chest pain which may or may not be very severe; shortness of breath; sweating; pallor; general malaise or weakness, a fall in blood pressure, which is shock; * * *."

As I have said, there was no evidence of chest pain, shortness of breath, pallor, general malaise or weakness or shock at any time during the day of his work or during the hour of his riding home. Quite the contrary. There was testimony of sweating during the ride home, but that testimony was that all of the occupants of the car were sweating, it being an August day. The first testimony we have of chest pain, etc. is from the widow who says she observed it when he got home. If the case presented merely a choice between believing her or not believing her, I would conclude that *Close* requires me to accept her testimony, since it was accepted below. However, the problem is more fundamental than that.

Going back to the three elements relied upon by Dr. Goodman, I do not find in the record any proof of "extreme heat." True, it was an August day but there was no proof of what the actual temperature was or that it or the humidity was extraordinary. Decedent worked in a room approximately 40 feet wide and 200 feet long containing 6 or 7 presses. He had worked in that room for three years. There is no suggestion that the room lacked proper circulation of air or that working in it was oppressive or that he or anyone else made any complaint about the heat or humidity.

I find in the record no evidence of the alleged emotional strain worthy of regard. Petitioner claimed that her husband's tools had been stolen about August 2nd and that this caused him to be very aggravated and upset to the day of his death. Because of the loss of his tools it is alleged that he had to use a micrometer which he did not like. It was also testified that he had told his wife he was dissatisfied with the job (at which he had worked for 25 years) and that he had too many bosses. These matters were incorporated in the following hypothetical question which was asked of Dr. Goodman and to which he gave the following answer:

"Well, doctor, keeping in mind what I have just mentioned to you, the micrometer, and what process that had to do so far as the manufacturing process here was concerned, can you tell us with reasonable medical probability what effect, if any, did the loss of his tools have upon this worker, in addition to, as he stated, that he was dissatisfied with the job, and the only reason that he didn't quit was the fact that he was working there so long, and as he further stated, that he had too many bosses.

Now, keeping those facts in mind, doctor, with reasonable medical probability what part, if any, did they play in the decedent's death?

    \*        \*        \*        \*        \*        \*        \*        \*

A. Well, from the way you have described it, this patient appeared to be under considerable emotional stress and strain from August 2nd until the time of his death, and it is my opinion that *this was a significant contributing factor to the cause of his death.*" (Emphasis ours.)

However, the evidence showed beyond any doubt that the tools were stolen in May, months before, and both the Division and the County Court rejected the August date as the date of the theft. That being the case, there was practically nothing left upon which to base the so-called "emotional strain." Therefore Dr. Goodman's conclusion that "this was a significant contributing factor to the cause of his death" was without foundation.

. As I have said, Dr. Goodman's opinion stood on three legs — extreme heat, emotional strain and physical exertion. I doubt whether the opinion can stand after we eliminate, as I think we must, the two legs of extreme heat and emotional strain. But assuming that the opinion can stand on the one leg of physical exertion, I find that Dr. Goodman's opinion was based upon a hypothesis not supported by the evidence. He was asked the following question and gave the following answer:

"Q. What part, if any, did his employment play in his death, with responsible medical probability, doctor, which I have outlined to you in the hypothetical question? A. Well, this patient apparently worked in a very — on that particular day in a very poor environment. You told me it was hot, muggy, and humid. Also, he engaged in considerable physical exertion: *hoisting* and moving coils, *pulling them up by pulleys with his arms over his head,* transferred them to a machine, putting them into this machine for processing, and so forth." (Emphasis ours.)

The fact of the matter is that *the decedent pulled nothing up by pulleys with (or without) his arms over his head.* Petitioner admits that there was no such testimony. Moreover, I find that the testimony does not support the hypothesis that decedent did any manual "hoisting." In any event, "pulling [coils] by pulleys with his arms over his head * * *" alone is obviously a critical factor upon which the doctor gave his answer. Incidentally, neither that factor nor "hoisting" by decedent manually was contained in the hypothetical question. It was volunteered by the doctor and shows that he over estimated the physical exertion. In any event, his supposition of hoisting and "pulling * * * by pulleys with his arms over his head" being without foundation, his opinion based thereon falls with it.

It may be argued that Dr. Goodman spoke of "considerable physical exertion" but did not define it and therefore we should assume that he based his opinion on the facts given in the hypothetical question as constituting such exertion even though he added to them. But I do not see how we can ignore what he did add and say his opinion would have been the same without the addition.

It is argued further that even on the basis of the employer's description of the work, Dr. Goodman said it contributed to his death. On cross-examination it was stated to Dr. Goodman that decedent sat while at work, checked small metal pieces as they came out of the machine, stacked them, put a wire through them and then, "while in a sitting position, he would turn around" and put a stack of the pieces weighing 10 to 12 pounds on a "flat" or pallet. The doctor said that assuming "that during the course of a working day, allowing for breaks, lunchtime, and so forth, approximately every 4 or 5 minutes he lifted a twelve pound weight off the machine and placed it on a flat adjacent to him * * * I would consider this sufficiently exertional in a person with preexisting disease to have contributed to his death."

The only proof of a preexisting disease was that in 1953 he learned that he had diabetes and thereafter he endeavored

to diet but he had no further medical attention. At no time during the years he worked for Western Electric Company did he show any signs of illness or report any difficulties that indicated a preexisting disease. Hence, I have difficulty in understanding what preexisting disease Dr. Goodman was talking about.

In short, Dr. Goodman's testimony seems to me to add up to no more than that decedent worked, therefore his death was work-connected.

I would reverse.